*1350 Opinion
VOGEL (Miriam A.), J.
When two young children were essentially abandoned by their parents and taken into protective custody, their paternal grandmother gave them a home. They lived with her for three years, during which time the Department of Children and Family Services regularly praised the grandmother and the manner in which she cared for the children. When the parents stopped visiting and the children got older, there were behavioral problems and the children were removed from the paternal grandmother’s home. She did not contest the case worker’s recommendation to place the children elsewhere, but did seek de facto parent status so that she could continue to be heard concerning their care. Her request was denied, for the stated reason that her inability to control the children justified that decision. Reading between the lines, we suspect the petition was denied either because the juvenile court found the grandmother’s involvement too time consuming (she attended every hearing and was not shy about expressing her views) or too expensive (because she had not, until then, demanded a lawyer). Whatever the real reason, the record does not support the order. We reverse.
Background
Vincent C. was born in October 1990, and his sister Crystal in May 1992. Andrea P., their mother, is a sometimes dmg addict with no apparent interest in caring for her children, and Damone C., their father, is now in state prison. In March 1993, Vincent and Crystal (and their half-brother, Terrell T.) were taken from Andrea by DCFS and placed with Wanda P. (Andrea’s mother, the maternal grandmother of all three children). On good days, the children had been left at home alone and without food while their mother got high on booze and dmgs. One really bad day, they got to watch their father attack Andrea with a machete (as a result of which she needed 34 stitches). On March 24, a petition was sustained (Welf. & Inst. Code, § 300),[1] after which Vincent and Crystal were placed with Marie C. (Damone’s mother, their paternal grandmother). Terrell was released to his father and he is not involved in these proceedings.
From the beginning, the case workers’ efforts to get Andrea and Damone involved with the care of their children were a complete waste of time, and in late 1993, the case worker recommended that Vincent and Crystal remain with Marie, who from the outset “provide[d] appropriate care” for them. For three years, that is where Vincent and Crystal lived, with DCFS’s unqualified approval. The reports were glowing.
*1351 In May 1994, the case worker reported that “Vincent and Crystal [were] continuing] to receive consistent and appropriate care by . . . Marie . . and that Marie had “expressed a willingness to adopt” the children. DCFS recommended that Vincent and Crystal remain with Marie and they did, with the blessing of the court. In August, the case worker reported that Andrea and Damone were still uninvolved, that the children remained with Marie, “who continue[d] to take excellent care” of them, and that Marie “want[ed] to adopt her grandchildren to ensure their continued safety and well-being,” a plan supported by DCFS, Damone and both children. Even Andrea wanted her children to stay with Marie. In October 1994, Marie told the case worker that she was having second thoughts about adoption, but not about keeping the children (she said they would “always have a home” with her). She was simply concerned that a formal adoption would confuse the children, who “kn[e]w their parents and look[ed] forward to their visits.” Andrea and Damone both told the case worker they were “very agreeable to this arrangement” and both praised Marie’s care of their children. Vincent and Crystal told the case worker they were “happy living with their grandmother.” The case worker recommended long-term foster care with Marie. The court terminated reunification services for both parents and ordered DCFS to provide permanent placement services.
In April 1995, the case worker reported that Marie was “continuing] to take excellent care of her grandchildren.” Damone (who was not yet incarcerated) visited frequently but Andrea’s visits were sporadic. Marie, who lived in Hollywood and did not have a car, knew how much the children wanted to see Andrea and frequently took them by bus to Long Beach to visit their mother. As the social worker put it, Marie “knows it is very important for her grandchildren to see their mother often.” By then, Crystal had been identified as a special needs child (she has a hearing problem). Vincent was in kindergarten and was “very bonded” to both his father and Marie. The case worker, the parents, the children and Marie all favored a continuation of the long-term placement in Marie’s home, and the court agreed. A virtually identical report was submitted by the case worker in October 1995.
In December 1995, a new case worker was assigned to the case and in April 1996, the first question was raised about Marie’s continuing ability to care for the children. The new case worker “found this family to be very much in need of support and services” because the children were “totally out of [Marie’s] control.” Marie told the case worker she was having problems with the children and described “destructive behavior” by Vincent, who had ripped electrical wires from lamps, and broken doors and toys. Both children “willfully ignore[d] their Grandmother.” Marie also described some “dangerous and potentially] life threatening situations involving . . . Vincent” *1352 (he had pulled away from Marie’s hand and run into the street, had tried to get off a carnival ride while it was in motion, and had turned off a department store escalator while it was in use). According to Andrea and Wanda (Andrea’s mother) and the children’s teachers, Vincent and Crystal behaved better when they were away from Marie. Marie recognized the problems and was “cooperative in her attempts to remedy her grandchildren’s behavior . . . .” Both children were in therapy. Part of the problem was that Damone was no longer around (by this time, he was in state prison).
As the case worker conceded, however, it was Marie who took “it upon herself to set up appointments for Vincent to have psychological testing done by Children’s Hospital.” It was Marie who got Crystal involved in a Head Start program and obtained speech therapy for her. Nevertheless, the case worker was of the view that Marie ought to be examined by a psychologist. Marie did not take kindly to this idea. She told the case worker “there was nothing wrong with her and she wasn’t nuts and then told [the case worker] to have the psychologist come to the house and stay overnight to see how Vincent behaves and then tell her what to do.” The case worker recommended to the court that it order a psychological evaluation of Marie, to ascertain whether she “ha[d] the emotional capacity to adequately care for her two grandchildren with their special needs.” At the same time, the case worker described Marie as a “very well meaning, sweet lady who is very specific about wanting only the best for both of her grandchildren. Yet, she is constantly frustrated and overwhelmed in her attempts to appropriately control and discipline Vincent and Crystal.” School officials suggested to the case worker that the children might be better off away from Marie and in a “residential placement with an on-grounds school . . . .” The children wanted to stay where they were. The case worker did not recommend a change at that time but did recommend against legal guardianship for Marie.
At a hearing held in April 1996, the court was advised that Damone would be incarcerated until “sometime in 2,002” but had remained in close contact with Marie and wanted the children to stay with Marie. When the court indicated its intent to order a psychological evaluation of Marie, the attorney representing the children supported that plan and expressed concern about Marie’s ability to handle Vincent, who was missing school too often (it may have been at the school’s request, because of his behavior). The court explained to Marie that it was going to order a psychological evaluation of her and she agreed to do whatever the court ordered. Marie, who had been caring for the children for more than three years, was not represented by counsel at this hearing (or at any earlier time).
After the April hearing, the principal of the school attended by both Vincent and Crystal wrote to the case worker to express her concern about *1353 Vincent’s behavior, explaining that although Marie had “obvious affection for the children” and kept them clean and well dressed, she was unable to control them. The principal was clearly unhappy with Marie, who frequently came to the school to demand more or different attention for the children, and who blamed the school for their behavioral problems. In a separate letter, Vincent’s teacher agreed that Marie had her grandson’s best interests at heart but opined that Marie was unable to control Vincent.
Around the same time, a psychologist at Children’s Hospital wrote to the case worker, explaining that Marie had brought Vincent in for an assessment. According to the psychologist, Marie “exhibited significant distress, spoke very rapidly, and had a difficult time listening to . . . feedback.” After testing and interviewing Vincent and talking to his principal, the psychologist was of the opinion that Vincent needed a structured environment with limits imposed, and that both children would do better out of Marie’s home because Marie was “clearly overwhelmed.” The psychologist emphasized that Marie loved her grandchildren but simply was unable to handle them.
In May 1996, the court-ordered psychological evaluation of Marie and the children was completed. According to the case worker’s subsequent report (the evaluation is not in the record on appeal), the doctor recommended a more structured environment for the children. In June, the case worker recommended that both children be removed from Marie’s home “and placed into a structured, therapeutic residential placement . . . .” At the next hearing (June 6), the court expressed concern about the reports and ordered DCFS to file a section 387 petition. On June 12, the children were taken from Marie’s home and placed at “The Little People’s World.” On June 14, the court arranged to have Wanda (the maternal grandmother) evaluated as a potential caretaker and denied Marie’s request that an attorney be appointed to represent her, commenting: “That request is denied. The court has read and considered the [psychological] evaluation. The paternal grandmother wants to hire an attorney, she can do that at any time.” On the same day, the supplemental petition requested by the court was filed, with allegations that Marie was no longer able to care for the children.[2]
On June 17, the parties stipulated (Marie was the only one not represented by counsel) that the children remain at the Little People’s World for 30 days, *1354 where they would be assessed to determine whether (1) residential treatment was necessary or (2) whether they ought to be placed with Wanda or (3) whether they ought to be returned to Marie’s home. At a June 24 hearing at which Marie may or may not have been present (the record does not reflect whether she was there),[3] the children’s attorney represented to the court that, at the June 11 hearing, Marie “was denied de facto parent status.” In fact, no such request was made (on June 11 or at any earlier time), let alone denied.
In late June, yet another new case worker took over this matter. On July 10, she recommended to the court that the children remain at Little People’s World and that the matter be continued for another month. She also reported that although the children were “adjusting pretty well in placement, their behavior problems continue[d] to exist.” Crystal was enrolled in speech classes. Vincent was “very hyper.” On July 11, the matter was continued. On July 15, when the matter was about to be continued yet again, Marie asked to be heard: “I just want to state my case. I’ve been coming here. I’ve been doing everything the court ordered me. . . . I’ve been denied [an] attorney. I’ve been denied to see the children .... When I came in here, you did not tell me I had to give them up. I did it on my own which was very hard, and I don’t feel like I’ve had a fair chance in this courtroom. They trust[ed] me with these children for three years .... Now I’m here today before you and I . . . don’t [know] anything that I’ve done wrong. If I have [done anything wrong], I think they need to tell me what I’ve done or what I need to do. And I have fulfilled all of your orders. . . . The social worker knew what I was going through with [the children]. They are hyper. . . . Give me my children back. . . . Why do I have to keep coming here listening to this. This is a trauma. Give me my two grandbabies back. . . . You won’t even give me an attorney. I have nobody but the Lord.”
The court told Marie that it had read the psychological evaluation, and thanked Marie for her cooperation with the psychologist. When the court suggested that the psychologist’s report appeared “favorable” to Marie, the mother’s lawyer disagreed. The children’s lawyer then suggested the evaluation showed that Marie was well-meaning and loved the children, but that they needed professional treatment and would do better away from Marie. Damone’s lawyer told the court that, in his view, the report supported placement with Marie. At that point, the court finally decided to appoint a lawyer for Marie, selected Elizabeth Seiberling from the courtroom, and told her it would require a “de facto motion and counseling with the grandmother *1355 that will be rather forceful in nature as far as giving strong legal advice and factual advice.” The court then addressed Marie:
“[I]f you are truly interested, you are ordered to participate in parenting classes and you’re also ordered to visit with the children, monitored, in a therapeutic setting. . . . [T]he children do have some pretty severe problems. They have problems, Ma’am, and you cannot handle their problems. Even though you love them, your manner of interacting with them is causing them harm and I’m not blaming you for that. I’m just asking you to learn a new way, so please listen. . . . You’ve got an attorney now.”
On August 9, the case worker recommended that the children remain at Little People’s World until their behavior stabilized, “hopefully by December,” at which time she would recommend placement “with an appropriate family member, if possible.” Vincent and Crystal both told the case worker they wanted to return to Marie’s home. Damone wanted the children to be returned to Marie. Andrea, however, wanted them placed with Wanda (her mother). Marie wanted them back. A psychologist recommended continued placement in a group home environment for Vincent and a specialized educational program for Crystal.
On August 9, with the stipulation of all parties (including Marie), the court sustained the supplemental petition. At that hearing, the court was prepared to hear a motion for de facto status filed by Marie’s attorney, but continued it because no opposition had been filed, making it clear that the court wanted and “need[ed] opposition.” On September 5, the court was advised by the children’s lawyer that Little People’s World was “medicating these kids because of behavioral problems and not because of a medical diagnoses] . . . .” It seems both children were given Ritalin or some other psychotropic medications solely to control their behavior, not because it was medically appropriate, and the case worker was, for this reason, considering removal from Little People’s World and placement with Wanda.[4] The court found the children were being medicated unnecessarily to control “acting out behavior,” ordered DCFS to “look into that” and, if necessary, ordered DCFS to immediately remove the children.
On September 17, the case worker reported that Vincent and Crystal had been removed from Little People’s World on September 10 and placed with Wanda, where the case worker recommended they remain. At the hearing *1356 held on that date, where a permanent plan was to be considered, the court suggested that they first dispose of Marie’s request for de facto parent status so that, if her motion was denied, there would be one less person involved in the further proceedings. The court said there was “a factual question to address under the circumstances presented in this case [because] the [supplemental petition had been] sustained and [because of] the report from the [psychological] evaluator.”
Marie’s lawyer emphasized that Marie was not seeking custody, only de facto status, which would give her the right to be represented by counsel and to participate in further proceedings involving the children. The court understood this, and said that Marie’s problems in “communicating” meant her participation would not assist the court. The court referred several times to the “negatives” concerning Marie, presumably with reference to her inability to control the children (since there is nothing else “negative” in the record). The attorney representing the children joined in Marie’s motion, emphasizing that Marie needed the assistance of counsel so that she could “have a voice” in the proceedings and “have a person who’s familiar with the proceedings assist her with that.” On behalf of the children, their lawyer explained that it was not in the children’s best interest to cut off Marie’s involvement and that, while Marie was not the best person to have custody, the children had been in “her care for quite a substantial period of time” and she “could have something to contribute in terms of [the] discussion of the placement of the children and her contact with them.” The father’s lawyer agreed, explaining that Marie’s involvement was a way for Damone to stay involved while he was incarcerated.
Only Andrea and DCFS opposed Marie’s motion (although it does not appear that either filed written opposition). After listening to them, the court denied Marie’s motion, explaining its view that Marie’s inability to control the children and her stipulation to the order sustaining the supplemental petition justified a denial of de facto status. Marie appeals from the order denying her motion for de facto parent status.
Discussion
Marie contends she is entitled to de facto status. We agree.[5]
In In re Kieshia E. (1993) 6 Cal.4th 68 [23 Cal.Rptr.2d 775, 859 P.2d 1290], our Supreme Court explained that when a nonparent caretaker commits “a substantial harm” to the child, a harm that is fundamentally at odds *1357 with the role of a parent, that person’s protectible interest in dispositional decisions is extinguished, including whatever right he might otherwise have had to de facto parent status. (Id. at p. 78, italics added.) As the court explained, “a nonparent who commits sexual or other serious physical abuse upon a child in his or her charge thereby abandons the function of care, affection, and psychological fulfillment essential to the role of a de facto parent. When a juvenile court has found that the nonparent committed such abuse, and has therefore deemed it necessary to make the victim a dependent of the court, the abuser is barred from intervening in the same proceeding under the de facto parenthood doctrine. The abuser forfeits the opportunity to appear as a party, be represented, and give evidence about disposition in a dependency proceeding caused by the misconduct.” (Id. at pp. 79-80, italics added.)
In our case, the juvenile court’s reliance in Kieshia E. was misplaced. There is not a shred of evidence that Marie did anything to abuse or otherwise cause harm to Vincent or Crystal, and her stipulation to the order sustaining the supplemental petition was not an admission of wrongdoing. Read in context, it is clear that no actual wrongdoing was alleged and that the only thing the stipulation meant was that Marie recognized her present inability to care for her grandchildren. Thus, although the record suggests that Marie is an aggressive, outspoken and demanding grandmother, the record is clear that she has done nothing wrong. Under the law, therefore, there was no reason to deny her motion for de facto status.
Rule 1401(a)(4), California Rules of Court,[6] defines a “de facto parent” as a “person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child’s physical and psychological needs for care and affection, and who has assumed that role for a substantial period.” Clearly, Marie did just that for three years, and it is for this reason that she is entitled to be heard in the future.[7] Indeed, as the children’s lawyer tried to explain to the court, it is because of Marie’s extended involvement and familiarity with the children that her input regarding their future care is so important to the children, not just to Marie. As the Supreme Court explained in Kieshia E., the de facto parent doctrine “simply recognizes that persons who have provided a child with daily parental concern, affection, and care over substantial time may develop legitimate interests and perspectives . . . which should not be ignored in a *1358 juvenile dependency proceeding.” (In re Kieshia E., supra, 6 Cal.4th at p. 77.)[8]
In our view, a juvenile court should not deny a request for de facto status based upon some vague concern that such participation will lengthen the hearings or somehow interfere with the goal of providing the child with a stable and loving home. To the contrary, where a grandparent or other close relative has cared for a dependent child for an extended period of time and has never done anything to cause substantial or serious harm of any kind to that child, there ought to be a very good reason for denying de facto status—particularly where, as here, the caretaker concedes that she is no longer able to care for the children herself and simply asks to be heard regarding their future placements. (See, e.g., In re Joshuia S. (1988) 205 Cal.App.3d 119, 122-125 [252 Cal.Rptr. 106]; Christina K. v. Superior Court (1986) 184 Cal.App.3d 1463, 1466-1469 [229 Cal.Rptr. 564]; Charles S. v. Superior Court (1985) 168 Cal.App.3d 151, 156-157 [214 Cal.Rptr. 47]; rule 1412(e) [the juvenile court may recognize the child’s present or previous custodian as a de facto parent and grant standing to participate as a party in disposition hearings and any hearing thereafter at which the status of the dependent child is at issue].)
All of the factors favoring de facto parent status are present in this case. Both children are psychologically bonded to Marie, who for three years “assumed the role of a parent on a day-to-day basis . . . .” (In re Patricia L., supra, 9 Cal.App.4th at p. 67.) Marie “possesses information about the children] unique from the other participants in the process.” (Ibid.) Marie “has regularly attended juvenile court hearings.” (Ibid.) A “future proceeding may result in an order permanently foreclosing any future contact with” Marie. (Ibid.) Marie has never committed “a substantial harm” to the children. (In re Kieshia E., supra, 6 Cal.4th at p. 78.) When all of these factors exist, the court will usually benefit from the additional input it will receive (and can simply disregard that input if it is not helpful), and de facto parent status should be liberally granted. (In re Patricia L., supra, 9 Cal.App.4th at p. 67.)
We reject DCFS’s contention that Marie’s “conduct” justifies the juvenile court’s order. While we do not believe Marie should have maligned Andrea, the notion that Marie caused substantial harm by talking about Andrea in *1359 front of the children is silly in light of Marie’s efforts to take the children by bus from Hollywood to Long Beach to visit a mother who was unwilling to come to them. The notion that Marie did something substantially wrong by (as was alleged) allowing a mentally ill relative to visit the home (not to care for Vincent or Crystal) is depressing because it carries with it the implicit suggestion that mental illness is contagious and that those who suffer from it ought to be ostracized. There was no allegation that the relative posed a danger to anyone, only that he behaved in an “irrational manner.”
If Marie caused disruptions at the children’s school, it was out of frustration with her inability to get the help she needed to control the children. If Vincent indeed pulled a plug from a lamp and broke a door and once ran out in traffic and another time jumped off a ride while it was in motion, all that means to us is that he is a kid in need of more control, who was properly placed in another home, not that Marie is to be equated to the child molester before the court in In re Kieshia E. It bears repeating that, by the time she sought de facto parent status, Marie did not want the children back in her home. All she wanted was a court-appointed lawyer to speak on her behalf. Since the first place the County put her grandchildren when they were taken from Marie’s home chose to “control” them with psychotropic drugs, she can hardly be criticized for demanding more from the system. There was no legal basis for DCFS’s opposition to de facto status for Marie and no legal basis for the order denying her motion. (In re Patricia L., supra, 9 Cal.App.4th at pp. 66-68 [where the factors favor de facto parent status, it should be granted so the court will not be deprived of critical information relating to the children’s best interests].)
Disposition
The order denying Marie C.’s motion for de facto parent status is reversed and the cause is remanded to the juvenile court with directions to enter a new order granting the motion and appointing an attorney to represent Marie C.
Ortega, Acting P. J., and Masterson, J., concurred.

All section references are to the Welfare and Institutions Code.

The supplemental petition alleges that the children were placed in Marie’s home in May 1993; that the children “have special and unique behavior problems and Marie ... has a limited ability to deal with such problems. Further, on numerous occasions, Marie. . . placed minors in endangering situations. The endangering included: saying disparaging remarks about minors’ mother in minors’ presence, allowing Albert [C.], minors’ paternal uncle who has mental problems, to visit minors’ home and to exhibit irrational and irresponsible behavior, and disrupting minors’ class at school.”

The minute orders do not show Marie’s appearances even when we know from the reporter’s transcript that she was there (because someone said so or because Marie asked to address the court). The reporters’ transcripts do not indicate her appearance because she was not represented by counsel. Basically, she was treated as a nonperson.

The court did not express surprise when one of the attorneys said that when a residential facility submits a request to the court for permission to medicate a dependent child, the medicine is given immediately, on the assumption that the request will be granted. At least with regard to psychotropic drugs, we do not believe this is an acceptable practice unless there is a genuine emergency.

Marie is before us in propria persona. Her briefs do not conform to any of the rules on appeal, and we have not relied on any information she has recited. She made her initial point by explaining that she was denied de facto status after she cared for her grandchildren for three years. The record does the rest for her.

All rule references are to the California Rules of Court.

Without de facto status, Marie could be excluded from future hearings. (Rule 1410(b)(2) [a grandparent is entitled to be present at juvenile proceedings only if no parent is available]; see also rule 1412(f) [upon a “sufficient showing,” the court may permit relatives to be present].)

Under rule 1412(e), a person afforded de facto status may be present at hearings, be represented by appointed counsel, and may present evidence. De facto parents are not entitled to reunification services (In re Kieshia E., supra, 6 Cal.4th at p. 77, fn. 7) but they are entitled to notice of all proceedings (In re Patricia L. (1992) 9 Cal.App.4th 61, 68 [11 Cal.Rptr.2d 631]).